**Affirmed and Memorandum Opinion filed January 28, 2020.**



In the

# Fourteenth Court of Appeals

### NO. 14-19-00622-CV

## IN THE INTEREST OF J.J. AND T.J., CHILDREN

**On Appeal from the 314th District Court
Harris County, Texas
Trial Court Cause No. 2018-03941J**

## MEMORANDUM OPINION

The issues in this case involve whether the trial court's findings to terminate a mother's parental rights are supported by legally- and factually-sufficient evidence. This accelerated appeal arises from a final order in which, after a bench trial, the trial court terminated the parental rights of appellant S.S.N. (Mother) with respect to her children, two-year-old J.J. (Jane) and one-year-old T.J. (Tippy),[1] and appointed appellee Department of Family and Protective Services (DFPS) to be the

---

[1] To protect the minors' identities, we have not used the actual names of the children, parents, or other family members. *See* Tex. R. App. P. 9.8.

children's sole managing conservator. *See* Tex. Fam. Code Ann. § 109.002(a-1); Tex. R. App. P. 28.4 (accelerated appeals in parental-termination cases). The trial court also terminated the parental rights of the unlocated or unknown father of Jane,[2] and of Tippy's father R.J. (Randy).[3]

Only Mother appeals. In three issues, Mother challenges the legal and factual sufficiency of the evidence to support the trial court's findings on the predicate grounds of endangerment and failure to comply with the family-service plan, and the legal and factual sufficiency of the evidence to support the trial court's finding that termination is in the best interest of Jane and Tippy. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (O), (b)(2). We affirm.

## I. BACKGROUND

### A. Pretrial proceedings

#### 1. Pretrial removal affidavit

Mother related that she was removed from her own mother's home by DFPS due to abuse and neglect. DFPS had custody of Mother until she was 18-years old. When she was an adolescent, Mother was treated for depression and bipolar disorder. Mother, however, had not taken any medication for bipolar disorder since leaving DFPS's custody nearly six years before the investigation relating to this case.

The investigation of this case by Child Protective Services (CPS) began with a February 2018 report alleging that Mother, while pregnant with Tippy,[4] had gone

---

[2] *See* Tex. Fam. Code Ann. § 161.002(b)(2)(A), (B).

[3] The trial court terminated Randy's parental rights regarding Tippy based on the predicate grounds of endangerment, constructive abandonment, and failure to comply with the family-service plan, in addition to the best-interest determination. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (N), (O), (b)(2).

[4] Jane was one-year old at the time of Mother's hospitalization.

to the hospital after being pushed down during an altercation with her mother. According to the report, Mother tested positive for marijuana at the hospital; Mother claimed she had mistakenly eaten a pot brownie at a party and would never put her unborn child at risk.[5] During her hospital stay, Mother gave birth to Tippy, who was born at 25-weeks gestation and was admitted to the neonatal intensive care unit due to respiratory distress. According to the CPS report, Mother tested negative for illegal substances at the time of Tippy's birth.

On several occasions in the months that followed, Mother failed to attend drug counseling sessions or complete requested substance-abuse testing. In addition, an August 2018 unannounced walkthrough of the home where Mother was living with one-year-old Jane and infant Tippy revealed it to be "in disarray and cluttered," with a pervasive cockroach infestation appearing in every room in the house, and piles of laundry stacked in several corners, which could potentially have fallen and harmed a small child. In addition, Mother was looking after the children with Randy, Tippy's father, without the supervision of Mother's aunt, who had agreed to monitor the children.

On August 21, 2018, DFPS requested appointment as emergency temporary sole managing conservator of Jane and Tippy under Family Code chapter 262 and sections 105.001(a)(1) and (h). The trial court signed an order granting the request that same day. On September 18, 2018, a full adversary hearing was held, after which the trial court appointed DFPS as the temporary sole managing conservator of Jane and Tippy.

---

[5] According to the affidavit, Mother later told an investigator that she had used marijuana near the end of her pregnancy due to nausea.

### 2. Family-service plan

DFPS prepared a family-service plan for Mother in September 2018. The plan required Mother to complete a list of tasks and services, including:

- maintaining monthly contact with DFPS;
- completing random drug testing (urinalysis and hair follicle);
- refraining from illegal activity;
- completing a substance-abuse assessment, participating in services recommended on the basis of the assessment, and abstaining from the use of drugs and alcohol;
- completing a psychosocial evaluation and participating in services recommended on the basis of the evaluation, including individual therapy;
- maintaining stable income;
- attending all court hearings, family visits, and permanency conferences relating to her children;
- maintaining stable housing; and
- completing parenting classes.

## B. Trial

### 1. Documentary evidence

The trial court admitted the following documents concerning Mother's criminal history:

- a 2013 judgment convicting Mother of deadly conduct based on allegations she threatened her sister with a knife, *see* Tex. Penal Code Ann. § 22.05, for which Mother was sentenced to 180-days confinement;
- a 2014 judgment convicting Mother of criminal mischief based on allegations she damaged the windshield of a car belonging to a family member by striking it with an unknown object, *see* Tex. Penal Code Ann. § 28.03, for which Mother was sentenced to four-days confinement;

4

- a 2015 judgment convicting Mother of criminal mischief based on allegations she damaged a window belonging to a non-family member by throwing a shoe at it, *see id.*, for which Mother was sentenced to 20-days confinement; and

- a 2016 judgment convicting Mother of making a terroristic threat based on allegations she threatened to murder a non-family member, *see* Tex. Penal Code Ann. § 22.07, for which Mother was sentenced to six-days confinement.

Also admitted was a police report detailing a complaint that Mother made on November 8, 2018, in which Mother stated that Randy punched her in the face several times, hitting her so hard she "saw stars." She told police it was "difficult to talk due to how bad her lips hurt and how swollen her face was," and described Randy as "very violent." At the time, Mother and Randy had been in a relationship for four years. Mother later declined to press charges against Randy.

The trial court also admitted Mother's drug-screening records. Mother's hair-follicle tests were consistently positive:

- Mother's hair-follicle sample taken March 15, 2018—fewer than three weeks after Tippy's birth—tested positive for benzoylecgonine (cocaine metabolite), cocaine, and marijuana metabolite;

- Mother's hair-follicle sample taken September 4, 2018—the first test after DFPS was appointed emergency temporary sole managing conservator of Jane and Tippy in late August 2018—tested positive for amphetamine, methamphetamine, benzoylecgonine, cocaine, marijuana, and marijuana metabolite;

- Mother's hair-follicle sample taken September 18, 2018 tested positive for amphetamine, methamphetamine, benzoylecgonine, and cocaine;

- Mother's hair-follicle sample taken October 9, 2018 tested positive for methamphetamine, benzoylecgonine, cocaine, norcocaine, marijuana, and marijuana metabolite;

- Mother's hair-follicle sample taken December 6, 2018 tested

positive for benzoylecgonine and cocaine;

- Mother's hair-follicle sample taken January 24, 2019 tested positive for benzoylecgonine, cocaine, and marijuana; and

- Mother's hair-follicle sample taken May 7, 2019 tested positive for benzoylecgonine, cocaine, and marijuana.[6]

## 2.  Caseworker

Caseworker Jessica Gomez testified that Mother had completed numerous tasks assigned to her by the family-service plan. Mother had completed a psychosocial evaluation and a substance-abuse assessment. She had completed parenting classes and anger management classes. She had also completed outpatient treatment and group and individual therapy for substance abuse. She had attended all court hearings and almost all of the scheduled visits with her children, and had behaved appropriately and engaged with the children during the visits.

Mother, however, had not provided proof of stable housing, and had not submitted a pay stub or other proof of consistent employment since January 2019, several months before trial. In addition, despite the substance-abuse services she completed, Mother continued to test positive for illegal drugs, primarily cocaine. Further, while the family-service plan required Mother to refrain from criminal activity, Mother had two pending charges for assault of a family member (her sister and her mother) and one pending charge of resisting arrest at time of trial.

In addition, Gomez discussed two incidents concerning Tippy's father Randy. With regard to Mother's November 2018 police report that Randy had punched her, Gomez testified that Mother characterized the event as a "misunderstanding," said that Randy was "not abusive," and continued her relationship with Randy after the

---

[6] Mother's substance-abuse panels based on urine specimens were consistently negative, though Mother submitted an adulterated sample on July 13, 2018, and caseworker Jessica Gomez testified that Mother skipped numerous screening appointments.

incident. In addition, Gomez witnessed the aftermath of Randy's arrest for possession of crack cocaine during a family visit after DFPS had taken temporary custody of the children, arriving on the scene when Mother, who had arrived at the visit with Randy, was being interviewed in connection with the incident.[7]

Gomez reported that Jane and Tippy were currently placed in a foster home and were "doing well," with no special needs. The long-range goal of DFPS was unrelated adoption by the foster father, who attended trial.

### 3. Mother

Mother attested to the accuracy of photographs showing that the house she had been living in immediately before removal of the children was cluttered and cockroach infested, though she attributed the state of the house to flooding. She admitted that the home environment was not appropriate for raising children at the time of the visit.

Mother testified she was currently living with her grandfather. She stated that her grandfather had told her she could live with him as long as she wanted, though she later admitted that her grandfather had threatened to kick her out on one occasion.

Mother was unemployed at the time of trial. She had not held a job since working at McDonald's in mid-March 2019, some four months before trial. She stated she was seeking employment but her efforts had been hampered by hospital visits for treatment of her asthma.

Regarding her police report of family violence against Randy, Mother testified

---

[7] Randy was later convicted of possession of a controlled substance in penalty group one, less than one gram. Texas Controlled Substances Act, Tex. Health & Safety Code Ann. §§ 481.102, 481.115(a), (b). After this incident, which occurred at DFPS's offices, Randy was denied visitation of the children.

that Randy "got aggressive and just hit me" and "got mad and punched me in my lip," but averred it was the only time Randy had ever hit her. Mother asserted her Fifth Amendment right against self-incrimination when asked about the pending charges against her for assaulting her mother and sister and resisting arrest. *See* U.S. Const. amend. V. She denied having threatened her sister with a knife as alleged in her 2013 conviction, though admitted she had been convicted of deadly conduct based on that allegation.

Mother testified she did not "agree" with the results of her positive drug tests. She stated that she had not used drugs while pregnant with Tippy. She admitted that she had tested positive for cocaine throughout the life of the case, but denied having a cocaine problem. When asked how the cocaine wound up in her test results, she answered, "Honestly, I don't even know, sir."

## II.    ANALYSIS

In Mother's first issue, she challenges the legal and factual sufficiency of the evidence to support the trial court's finding on the predicate ground of endangerment. In Mother's second issue, she challenges the legal and factual sufficiency of the evidence to support the trial court's finding on the predicate ground of failure to comply with the family-service plan. In Mother's third issue, she challenges the legal and factual sufficiency of the evidence to support the trial court's finding that termination is in the best interest of the children.

### A.    Standards of review

Involuntary termination of parental rights is a serious matter that implicates fundamental constitutional rights. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re D.R.A.*, 374 S.W.3d 528, 531 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Although parental rights are of constitutional magnitude, they are not absolute. *In re*

*C.H.*, 89 S.W.3d 17, 26 (Tex. 2002) ("Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right.").

Due to the severity and permanency of terminating the parental relationship, the law in Texas requires clear and convincing evidence to support such an order. *See* Tex. Fam. Code Ann. § 161.001(b); *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002). "Clear and convincing evidence" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *In re J.F.C.*, 96 S.W.3d at 264.

The heightened burden of proof in termination cases results in a heightened standard of review. *See id.* at 265–66. We review the legal sufficiency of the evidence by considering all evidence in the light most favorable to the finding to determine whether a reasonable fact-finder could have formed a firm belief or conviction that its finding was true. *Id.* at 266. We must assume that the fact-finder resolved disputed facts in favor of its finding if a reasonable fact-finder could do so, and we disregard all evidence that a reasonable fact-finder could have disbelieved or found incredible. *Id.* However, this does not compel us to disregard all evidence that does not support the finding. *In re D.R.A.*, 374 S.W.3d at 531. Because of the heightened standard, we also must be mindful of any undisputed evidence contrary to the finding and consider that evidence in our analysis. *Id.*

In reviewing the factual sufficiency of the evidence under the clear-and-convincing burden, we consider and weigh all of the evidence, including disputed or conflicting evidence. *In re J.F.C.*, 96 S.W.3d at 266. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have

9

credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id.* We give due deference to the fact-finder's findings, and we cannot substitute our own judgment for that of the fact-finder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam).

In a proceeding to terminate the parent-child relationship brought under Family Code section 161.001, the petitioner must establish, by clear-and-convincing evidence, one or more acts or omissions enumerated under subsection 1 of section 161.001(b) and that termination is in the best interest of the child under subsection 2. Tex. Fam. Code Ann. § 161.001(b); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).

## B.   Predicate termination grounds

The trial court made predicate termination findings that Mother had committed acts establishing the grounds set out in subsections D, E, and O of section 161.001(b)(1), which provides for termination of parental rights if the fact-finder finds by clear and convincing evidence that the parent has:

> (D) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child;

> (E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child;

> . . . [or]

> (O) failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child[.]

Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), and (O).

Courts have long recognized that due process "guarantees more than fair process" and "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). One of the most fundamental liberty interests recognized is the interest of parents in the care, custody, and control of their children. *See id.* at 65–66 ("[T]he custody, care and nurture of the child resides first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.").

Only one predicate finding under section 161.001(b)(1) is required by statute to support a final order of termination when there also is a finding that termination is in the child's best interest. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). Due process requires, however, that when a parent has raised the issue of insufficiency of the evidence to support the jury's findings under Family Code section 161.001(b)(1)(D) or (E), an appellate court must address one of those endangerment findings to ensure a meaningful appeal. *See In re N.G.*, 577 S.W.3d 230, 235–37 (Tex. 2019). Due-process and due-course-of-law requirements also mandate that an appellate court detail its analysis for an appeal of termination of parental rights under Family Code section 161.001(b)(1)(D) or (E). *See id.* In this case Mother challenges the legal and factual sufficiency of the evidence to support the jury's findings on the predicate grounds for termination. We, therefore, address the jury's endangerment finding under section 161.001(b)(1)(E).

"To endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or physical health. *See In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (per curiam); *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). A finding of endangerment under subsection E requires

11

evidence that the endangerment was the result of the parent's conduct, including acts, omissions, or failures to act. *In re S.R.*, 452 S.W.3d at 360. Termination under subsection E must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *Id.* A trial court properly may consider actions and inactions occurring both before and after a child's birth and before and after removal to establish a course of conduct. *Id.* at 360–61. "While endangerment often involves physical endangerment, the statute does not require that conduct be directed at a child or that the child actually suffers injury; rather, the specific danger to the child's well-being may be inferred from parents' misconduct alone." *Id.* at 360 (citing *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). A parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *Id.*

"Domestic violence, want of self-control, and propensity for violence may be considered as evidence of endangerment." *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.). Mother has a history of violence, including violence directed at her family. Mother has twice been convicted of crimes against family members, specifically deadly conduct for threatening her sister with a knife in 2013 and criminal mischief for damaging the windshield of her mother's car in 2014.[8] She has also been convicted of making a terroristic threat to murder a non-family member. Concerns about Mother's propensity for violence are only heightened by the pending charges against Mother, including charges that she assaulted her mother and her sister. Mother declined to testify about these charges by asserting her Fifth Amendment right against self-incrimination, permitting the

---

[8] Mother testified that she did not threaten her sister with a knife, but admitted she had been convicted of deadly conduct in connection with the incident. She did not contest her other convictions.

trial court to draw an adverse inference concerning the charges. *See* U.S. Const. amend. V; *Baxter v. Palmigiano*, 425 U.S. 308, 316–19 (1976) (in civil cases, court may draw adverse inference from assertion of Fifth Amendment privilege).

Violence also surfaced in Mother's relationship with Randy. Mother testified that Randy hit her in November 2018, stating in the report she made to police that she was hit so hard she "saw stars," it was "difficult to talk due to how bad her lips hurt and how swollen her face was," and Randy was "very violent." Mother, however, dropped the charges against Randy, remained in a relationship with him, and showed up with him for a visitation with the children later that same month, a visit at which Randy was arrested and ultimately convicted of possession of crack cocaine. While the violence concerning Randy and Mother's family members was not directed at the children, the trial court could have considered this evidence as part of an endangering course of conduct. *See In re S.R.*, 452 S.W.3d at 360 (explaining that parent's conduct need not be directed at children for court to infer endangerment to their well-being).

Drug abuse and its effect on the ability to parent can also present an endangering course of conduct. *See In re J.O.A.*, 283 S.W.3d at 345; *In re S.R.*, 452 S.W.3d at 361. Drug use can endanger a child "when the environment creates a potential for danger that the parent is aware of but disregards." *In re E.R.W.*, 528 S.W.3d 251, 264 (Tex. App.—Houston [14th Dist.] 2017, no pet.). Mother's first hair-follicle test was taken fewer than three weeks after Tippy was born, and tested positive for, among other things, cocaine and marijuana. The issue is not simply that Mother used these drugs—it is that she used them either while pregnant with Tippy or in the weeks immediately following her birth, when Tippy was a fragile infant.

Concerningly, Mother appeared unwilling even to admit she used drugs at all. While Mother testified she disagreed with the testing results, she offered no expert

13

testimony or other evidence indicating that the results of her hair-follicle tests were invalid. When asked how cocaine came to be present in each of the seven hair-follicle samples she submitted from March 15, 2018 to May 7, 2019, she replied that she "d[idn't] even know."

Mother notes that she "'trusted' [her] maternal aunt to care for the children by day." She proceeds to argue that, accordingly, her "conduct or actions sometime prior to removal indicate that she was accepting of the CPS approved placement and recognized the need to have her children protected." Although this comprises the bulk of her argument in opposition to the finding of endangerment under subsection E, we cannot conclude that it mitigates the weighty evidence of endangerment discussed above.

Considered in the light most favorable to the trial court's finding, we conclude that the evidence is legally sufficient to support the trial court's termination of Mother's parental rights under section 161.001(b)(1)(E) under these circumstances. Likewise, viewing the entire record, we conclude any disputed evidence is not so significant as to prevent the trial court from forming a firm belief or conviction that termination was warranted under section 161.001(b)(1)(E). Accordingly, we conclude that the evidence is factually sufficient to support the subsection E predicate finding.

In light of this conclusion, we need not address the trial court's findings on subsections D and O. *See In re A.V.*, 113 S.W.3d at 362. We overrule Mother's first two issues.

## C. Best interest of the children

In Mother's second issue, she challenges the legal and factual sufficiency of the evidence to support the trial court's finding that termination of her parental rights

14

is in the best interest of the children. *See* Tex. Fam. Code Ann. § 161.001(b)(2).

There is a strong presumption that the best interest of the children is served by keeping the children with their natural parents. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam) (citing Tex. Fam. Code Ann. § 153.131(b)); *In re D.R.A.*, 374 S.W.3d at 533. However, prompt and permanent placement of the children in a safe environment is also presumed to be in the children's best interest. *In re S.R.*, 452 S.W.3d at 366 (citing Tex. Fam. Code Ann. § 263.307(a)). Proof of acts or omissions under section 161.001(b)(1) is probative of the issue of the children's best interest. *See id.* The considerations that the fact-finder may use to determine the best interest of the children, known as the *Holley* factors, include:

(1) the desires of the children;

(2) the present and future physical and emotional needs of the children;

(3) the present and future physical and emotional danger to the children;

(4) the parental abilities of the person seeking custody;

(5) the programs available to assist the person seeking custody in promoting the best interest of the children;

(6) the plans for the children by the individuals or agency seeking custody;

(7) the stability of the home or proposed placement;

(8) acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and

(9) any excuse for the parent's acts or omissions.

*See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see also* Tex. Fam. Code Ann. § 263.307(b) (listing factors to be considered in evaluating "whether the child's parents are willing and able to provide the child with a safe environment"). A best-interest finding does not require proof of any unique set of factors, nor does it limit proof to any specific factors. *See Holley*, 544 S.W.2d at 371–72.

In reviewing the legal and factual sufficiency of the evidence to support the trial court's finding on best interest, we are mindful that the focus in a best-interest analysis is not only on the parent's acts or omissions, but also on the nature of the relationship the children have with the parent. *In re E.N.C.*, 384 S.W.3d 796, 808 (Tex. 2012).

### 1. The desires of the children and the plans for the children by the individuals or agency seeking custody

The children were removed when Jane was one-year old and Tippy was less than a year old. When children are too young to express their desires, the fact-finder may consider that the children have bonded with the foster parents, are well cared for by the foster parents, and have spent minimal time with a parent. *In re L.G.R.*, 498 S.W.3d 195, 205 (Tex. App.—Houston [14th Dist.] 2016, pet. denied).

Here, the evidence reflects that the children were "doing well" in foster care and had no special needs. DFPS's goal was unrelated adoption, and Gomez testified that DFPS was seeking termination so that the foster father, who attended trial, could adopt the children. *See In re C.H.*, 89 S.W.3d at 28 ("Evidence about placement plans and adoption are, of course, relevant to best interest.").

Mother concedes that it is "unrealistic" that the children will be returned to her, but argues that the children should be placed with one of her relatives. The only evidence in the record concerning relative placement demonstrates that a home study was conducted concerning Mother's grandfather, and that placement with the grandfather was denied. Moreover, while the children's anticipated placement is a factor in determining the children's best interest, the fact that placement will be with non-relatives is not a bar to termination. *See In re A.L.*, 389 S.W.3d 896, 902 (Tex. App.—Houston [14th Dist.] 2012, no pet.).

## 2. Present and future physical and emotional needs of the children and present and future physical and emotional danger to them

"Regarding this factor, we note that the need for permanence is a paramount consideration for the child's present and future physical and emotional needs." *In re D.R.A.*, 374 S.W.3d at 533. Establishing a stable, permanent home for a child is a compelling government interest. *Id.*

As noted above, the Family Code provides a list of factors that are to be considered in determining whether the child's parents are willing and able to provide the child with a safe environment. One of those factors is "whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home." Tex. Fam. Code Ann. § 263.307(b)(7). The evidence of endangerment discussed above details Mother's past convictions for deadly conduct and terroristic threat, and her pending charges of assault of two family members. The evidence further shows that Mother continued her relationship with Randy even after he punched her so hard she "saw stars."

In addition, while Mother completed many of the services set forth in the family-service plan, Mother failed to comply with the requirements that she maintain a stable residence and consistent income and refrain from using illegal drugs. At time of trial, Mother was living with her grandfather, who had threatened to kick her out of the house. Mother had not held any employment for the four months before trial. And Mother continued to abuse illegal drugs, continuing a cycle of behavior which began before implementation of the service plan and included testing positive for cocaine and marijuana weeks after Tippy was born. The trial court could have concluded from these acts and omissions that Mother is not able to provide stability and permanency for Jane and Tippy.

**3.     Any excuse for the parent's acts or omissions**

Mother did not offer excuses for her acts or omissions, but rather attempted to minimize or discredit evidence of her misconduct. Mother denied she had a drug problem or that she ever took cocaine, despite seven positive tests for cocaine over the course of this case. Mother also asserted that she did not threaten her sister with a knife, though she admitted she had been convicted of deadly conduct based on that allegation.

Under all the circumstances in this case and applying the applicable *Holley* factors to all the evidence, we conclude that legally- and factually-sufficient evidence supports the trial court's finding that termination of Mother's parental rights is in the children's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(2). We overrule Mother's issue challenging the trial court's best-interest finding.

### III.     CONCLUSION

Having concluded that the evidence is legally and factually sufficient to support the trial court's finding terminating Mother's parental rights under section 161.001(b)(1)(E) and the finding that termination is in the best interest of Jane and Tippy, we affirm the trial court's final order.


/s/     Charles A. Spain
Justice


Panel consists of Justices Zimmerer, Spain, and Hassan.

18